

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY ROWLAND, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 C 1957 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| HAVEN PROPERTIES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Kimberly Rowland brings a ten-count complaint against Haven Properties, LLC, Barrings Mortgage, Inc., Jeff Brandt, Mary Niego-McNamara, Quinn Niego, Joe Niego and Bridgeview Bank and Trust (collectively "defendants") for various federal and state law claims pertaining to the sale of her home. Rowland asserts defendants offered to save her home from foreclosure by giving her a mortgage, but instead engaged in predatory lending and created a sale and lease. Rowland's complaint was originally filed in the Circuit Court of Cook County; Haven removed the action to this court.[1] The state court issued a temporary restraining order barring defendants from pursuing an eviction action against Rowland or transferring, selling or taking any action affecting title to the home. Haven's motions to vacate the temporary restraining order and to dismiss the complaint were

---

[1] Haven is the only defendant to appear. On 7/7/05, the court issued a rule against Rowland to show cause why the remaining defendants should not be dismissed for failure to serve in accordance with Fed. R. Civ. P. 4(m). *See* Dkt. No. 32-1. Rowland did not file a written return on the rule by 7/19/05 as ordered. *Id.* Defendants Barrings Mortgage Inc., Jeff Brandt, Mary Niego-McNamara, Quinn Niego, Joe Niego and Bridgeview Bank and Trust are dismissed pursuant to Rule 4(m).

1

denied. *See Rowland v. Haven, et al.*, No. 05 C 1957, 2005 U.S. Dist. LEXIS 13353 (N.D. Ill. June 24, 2005); Dkt. No. 25. Rowland moves for a preliminary injunction.

## BACKGROUND

Unless otherwise noted, the following facts are taken from the verified complaint. After the death of her husband, Rowland fell behind in her mortgage payments. Compl. at ¶¶ 6-7. Foreclosure proceedings were commenced in July 2004. *Id.* at ¶ 7. A judgment of foreclosure was entered and a foreclosure sale was scheduled on February 23, 2005. *Id.* at ¶ 8. After the notice of foreclosure was filed, Rowland began receiving mailings, fliers and calls promising to help save her home. *Id.* at ¶ 9. On February 8, she received a letter signed by Quinn Niego of Barrings Mortgage indicating he "quickly refinanc[es] homes out of foreclosure!" *Id.* at ¶ 14. The letter assured Rowland that unlike a "typical mortgage broker," he would not string her along or ignore her phone calls. *Id.* Rowland telephoned Niego the same day she received his letter. *Id.* at ¶ 15.

The next day, Rowland met with Niego at the offices of Niego Realty. Niego told Rowland he would help her refinance her mortgage if it was not too late, and that he would call her the following day. *Id.* at ¶ 16. Niego did not call, nor did he return Rowland's calls. *Id.* On or around February 10, Rowland received a hand-delivered letter signed by Jeff Brandt of Haven Properties stating that he could help stop her foreclosure. Brandt indicated time was of the essence. *Id.* at ¶ 17. Rowland telephoned Brandt that same day. *Id.* at ¶ 18. She told Brandt that she met with Niego; Brandt indicated he had worked with Niego before. *Id.* On February 11, she met with Brandt at his office. *Id.* at ¶ 19. At the time, she did not realize that his office was upstairs from Niego Realty. *Id.* Brandt told her that Niego would not be able to act in time to refinance her home. *Id.* Rowland became distraught – crying and sobbing – and Brandt asked her why she was afraid. *Id.* Rowland

said she was afraid that Brandt was going to take her house from her. *Id.* Brandt assured her that he would help save her home. *Id.*

Over the next several days, Brandt visited Rowland's home, conducted a walk-through inspection and sent over a surveyor and appraiser. *Id.* at ¶ 21. On February 15, at Brandt's request, Rowland went to his office to sign paperwork. *Id.* at ¶ 23. Brandt indicated that he would pay off Rowland's existing mortgage and her car loans. *Id.* Rowland would be required to give Brandt monthly payments of $1300 for one year. *Id.* At the end of the year, Rowland would pay Brandt $99,000, or she could obtain refinancing through Niego. *Id.* Rowland was not given any documentation of the loan or the repayment terms. *Id.* Brandt presented Rowland with a form giving him her power of attorney so that he could request the payoff amounts from her mortgage and car loan lenders and then pay the loans. *Id.* at ¶ 24. Rowland was not given a copy of the power of attorney form. *Id.* Brandt also provided her with several other documents to sign; Rowland does not know what the documents she signed were nor did she receive copies of them. *Id.* at ¶ 25. Rowland was not represented by an attorney at the meeting. *Id.* at ¶ 26. Brandt told her an attorney was unnecessary because the transaction involved a small amount of money and because she was retaining her home. *Id.*

Around February 17, Brandt asked Rowland to come to his office to finalize the transaction. *Id.* at ¶ 27. The next day, Rowland met with Brandt in a room below his office and in the back of Niego Realty's offices. *Id.* at ¶ 28. Brandt presented her with a HUD settlement statement that reflected: (1) a contract sales price/gross amount due to seller price of $91,500.00; (2) that $78,593.61 would be paid to her mortgage company; and (3) that $6,751.43 would be paid to her car loan company. *Id.* at ¶¶ 28-29. Niego-McNamara was listed as the individual who received

3

"Buyer's Attorney's Fees" and "Seller's Attorney Fees." *Id.* at ¶ 31. Rowland asked whether she would receive any money in cash, since this was a refinance loan. Rowland wanted to repay her mother for a loan. *Id.* at ¶ 28. Brandt adjusted the settlement statement amounts, presented Rowland with a $3000 check and told her she would be required to pay him an extra $50 per month. *Id.* Rowland signed the settlement statement in reliance on Brandt's representation that the transaction would provide her with a home equity loan. *Id.* at ¶ 30. At no time did Rowland intend to sell her home. *Id.* Rather, she understood she was receiving a loan on her home from Brandt. *Id.*

After Brandt left, an unknown man came into the room and presented Rowland with additional documents to sign. *Id.* at ¶ 35. Rowland did not understand why more documents were necessary and they were not explained to her. *Id.* Rowland signed a Chicago apartment lease with a one year lease term with a monthly rent of $1350. *Id.* The man also had Rowland sign a rider to the lease. *Id.* Several days later, Rowland called the telephone number for Haven, the "Owner or Management Agent" listed on the lease, but the number was disconnected. *Id.* at ¶ 37.

Rowland was under a great deal of stress when she met with Brandt on February 18 because her home was scheduled to be sold at a foreclosure auction five days later. *Id.* at ¶ 38. Rowland asserts Niego and Brandt conspired to exacerbate her distress at the prospect of losing her home to take advantage of her and fraudulently obtain ownership of her home. *Id.* at ¶¶ 39-40. Defendants Haven Properties, LLC, Barrings Mortgage, Inc., Terry Niego and Quinn Niego – the companies' registered agents – have the same record address. *Id.* at ¶ 40. Mary Niego-McNamara signed the settlement statement on Haven's behalf. *Id.* Joe Niego is Barrings' president and secretary. *Id.* Rowland receives $2424 per month in social security payments, she was unable to satisfy her previous $785 mortgage payments on her income and therefore could not afford mortgage payments

4

of $1350 per month. *Id.* at ¶ 36. She asserts she never intended to deed away her home valued at $245,000, for a $91,500 loan. *Id.* at ¶ 41.

Haven's version of events differs from Rowland's in several key respects. Haven submits an affidavit from Brandt attesting he told Rowland that there was no time to list her home with a realtor or to refinance her home loan, but that Haven would make her an offer to purchase the home. Haven Resp. Ex. A. Brandt asserts there was insufficient time for Rowland to sell her home through traditional means and, because she insisted she did not want to move from her home, he negotiated a deal whereby Rowland would sell Haven her home and sign a lease with an option to buy back the home at the end of one year. *Id.* According to Brandt, he told Rowland she could hire an attorney to handle the real estate closing, but that Haven's attorney would prepare the closing documents because there was very little time and she would lose her home if the closing was delayed. *Id.* Brandt attests at one point, several days prior to closing, Rowland said "I can't believe I am selling my home." *Id.* Brandt contends he never told Rowland that Haven would issue her a loan or refinance her existing mortgage because: (1) Haven does not issue or refinance loans - it buys and sells real estate; and (2) it would be too risky for Haven to be placed in a second mortgage position on the property given the high likelihood that the homeowner will default. *Id.* Brandt contends he thoroughly explained each document to Rowland at closing. *Id.*

## DISCUSSION

### I. Legal Standard

A preliminary injunction maintains the *status quo* pending completion of the litigation. *See Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464 (7th Cir. 2001). Rowland bears "the burden of demonstrating that [she] has a reasonable likelihood of success on the

merits of [her] underlying claim[s], that [she] has no adequate remedy at law, and that [she] will suffer irreparable harm without the preliminary injunction." *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 803 (7th Cir. 2002). If Rowland cannot establish either of these prerequisites, the injunction must be denied. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the prerequisites are satisfied, the court considers "any irreparable harm the preliminary injunction might impose upon [Haven] and whether the preliminary injunction would harm or foster the public interest." *Daimlerchrysler*, 311 F.3d at 803-04. In weighing the parties' respective harms, "the court bears in mind that the purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Id.* at 804 (internal citation omitted).

> The court, sitting as would a chancellor in equity, "weighs" all four factors in deciding whether to grant the injunction, seeking at all times to minimize the costs of being mistaken. This process is called the "sliding scale" approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side. This weighing process also takes into consideration the consequences to the public interest of granting or denying preliminary relief. While the sliding scale approach has been framed in mathematical terms, it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.

*Abbott Labs*, 971 F.2d at 12 (citations omitted).

## II. Rowland's Motion for Preliminary Injunction

Rowland alleges that her transaction with Haven was a mortgage, not a sale. A deed may be considered an equitable mortgage depending on the parties' intentions. "Whether a deed is to be considered as an equitable mortgage depends on the parties' intentions. To convert an absolute deed into a mortgage, the proof must be clear, satisfactory and convincing and may come from almost every conceivable fact that could legitimately aid that determination." *Robinson v. Builders Supply*

& *Lumber Co.*, 223 Ill. App. 3d 1007, 1014, 586 N.E.2d 316, 320 (1st Dist. 1991) (citations omitted); *see also Beelman v. Beelman*, 121 Ill. App. 3d 684, 690, 460 N.E.2d 55, 58-59 (5th Dist. 1984) (whether a deed is considered a mortgage depends on the parties' intent at the deed's execution). "[S]tatements of the parties at and after execution of the instrument, as well as preliminary negotiations leading up to the transaction, have been held admissible to illustrate the purpose and intent of the parties." *Havana Nat'l Bank v. Wiemer*, 32 Ill. App. 3d 578, 584, 335 N.E.2d 506, 510 (3d Dist. 1975); *see also Silas v. Robinson*, 131 Ill. App. 3d 1058, 1062, 477 N.E.2d 4, 7 (1st Dist. 1985).

Material issues of fact exist that prevent the court from determining Rowland's probability of success on the merits without a hearing. The court must consider many factors when assessing whether a deed may be converted to a mortgage. One of the most critical factors, the parties' intentions, may be established by almost any conceivable evidence.[2] Rowland asserts that she sought a mortgage, Haven told her she was receiving a mortgage, and that she never would have sold her $245,000 home for $91,500. In contrast, Haven contends it never issues or refinances loans, that Rowland was fully aware she was selling her home and that the numerous documents Rowland signed selling the home reflect her true intent. In essence, the parties' intentions will become a "he said, she said" dispute between Rowland and Brandt requiring credibility assessments. In addition

---

[2] Other factors the court may consider include: (1) the existence of an indebtedness; (2) the close relationship of the parties; (3) prior unsuccessful attempts for loans; (4) circumstances surrounding the transaction; (5) disparity of the situations of the parties; (6) lack of legal assistance; (7) the unusual type of sale; (8) inadequacy of consideration; (9) the way the consideration was paid; (10) retention of the written evidence of the debt; (11) belief that the debt remains unpaid; (12) an agreement to repurchase; and (13) the continued exercise of ownership privileges and responsibilities by the seller. *McGill v. Biggs*, 105 Ill. App. 3d 706, 708, 424 N.E.2d 772, 774 (3d Dist. 1982).

7

to Rowland and Brandt's testimony regarding intent, other evidence, such as the nature of Haven's business and whether it has ever issued or refinanced loans, may be material and necessary to determine intent and, in turn, the probability of Rowland's success on the merits.

Considerations of irreparable harm also require a hearing. Rowland asserts she will lose her family home – as well as over $150,000 in equity – and that she and her children will be evicted if an injunction does not issue. Haven argues Rowland will not suffer irreparable harm because: (1) the loss of equity is an economic loss compensable by money damages; (2) Haven will not evict her if she timely pays her rent; and (3) Haven will not sell the property because Rowland has the option to buy it back. Haven asserts it has been harmed by making significant payments on Rowland's behalf since February 18, 2005, despite Rowland's failure to make any payments on the property. Haven contends it is a small business and the $1126.67 it pays monthly on Rowland's mortgage is a significant expense.

The sliding scale balance of irreparable harms permits the court to weigh competing considerations and mold appropriate relief. *See Abbott Labs*, 971 F.2d at 12. Assuming Haven has not overstated the economic strain imposed by its monthly payments on Rowland's behalf, the court must weigh whether that harm is irreparable and whether it outweighs the harm to Rowland. Haven's argument that Rowland's harm is not irreparable because she is in control of her own fate – if she pays rent and exercises her option to repurchase the home – ignores the purported reality of Rowland's financial situation. Haven suggests Rowland is able to afford the $1350 monthly rent payments now that certain debts have been satisfied on her behalf. The court is unable to assess the merits of this contention without further evidence from Rowland. Indeed, it seems dubious that Rowland could pay Haven approximately $1300 per month and $99,000 at the end of the year when

8

she could not afford her original $785 mortgage payments. Nevertheless, it is possible that Rowland's financial situation has improved. The court will not weigh competing issues of harm in the abstract.

Finally, further evidence is required before the court may address Haven's argument regarding bond. Haven argues bond should be required if the court grants injunctive relief. Federal Rule of Civil Procedure 65(c) provides: "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to be wrongfully enjoined or restrained." If preliminary injunctive relief is granted, Haven asserts Rowland must post security because Haven will be required to continue making mortgage payments to Washington Mutual without receiving rent. However, notwithstanding the language of Rule 65(c), bond may be excused under appropriate circumstances. *See e.g., Wayne Chemical, Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977). The court cannot determine whether bond is appropriate on the present record.

## CONCLUSION

Several issues preclude the court from determining the appropriateness of injunctive relief without additional evidence. Nevertheless, the court is reluctant to schedule a preliminary injunction hearing because discovery will be completed in less than two months. Trial on the merits would be substantially duplicative of a preliminary injunction hearing. Accordingly, the motion for

preliminary injunctive relief is consolidated with trial on the merits and the issue of permanent injunctive relief. The temporary restraining order shall remain in effect until that time.

August 11, 2005

ENTER:

Suzanne B. Conlon
United States District Judge